13750

VARN, COUNTY TREASURER, v. BEATTIE, COMPTROLLER GENERAL

(172 S. E., 442)

Mr. *W. Brantley Harvey* for petitioner.

*Messrs. John M. Daniel, Attorney General,* and *J. Ivey Humphrey and J. Ingram Wilson, Assistant Attorneys General,* for respondent.

January 9, 1934.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BLEASE.

In this proceeding, the relator, as County Treasurer of Beaufort County, seeks, in the original jurisdiction of this Court, a writ of mandamus, requiring the respondent, the Comptroller General of the State, to draw his warrant on the State Treasurer in favor of the relator for a certain balance, claimed to be due to Beaufort County, for the first month of.the 1933–1934 school session from the funds appropriated as State aid for the public schools of the State. Some of the matters alleged in the petition are controverted in the return of the respondent. From the record submitted, however, without going into the numerous figures set forth in the petition and return and accompanying papers, we find certain facts about which there appears to be no dispute, and we think on these we may properly determine the legal questions, which appear to us to be involved, and the determination of which will decide whether or not the mandamus prayed for should be granted.

The trustees of Beaufort School District No. 1 contracted to pay 20 teachers of the negro schools of that district, for the 1933–34 session, salaries on the basis of $50.00 per

month; 19 of these teachers are holders of first grade certificates, and one is the holder of a second grade certificate. The relator claims that the respondent, under the applicable school laws, in the warrant sent to him, should have included a sufficient amount to pay the teachers, who hold first grade certificates, at the rate of $50.00 per month, and the one teacher who holds a second grade certificate at the rate of $40.00 per month. The respondent only included a sufficient amount to pay those teachers at the rate of $37.50 per month, for the holders of the first grade certificates, and $30.00 per month for the holder of the second grade certificate. The respondent, in sending his warrant for the amount ascertained by him to be due to Beaufort County, acted upon the information, statements, and certificates furnished him by the office of the State Superintendent of Education. The State Board of Education and State Superintendent of Education fixed the salaries of teachers of the negro schools, so far as they were to be paid from State aid funds, at the rate of $37.50 per month for the holders of first grade certificates, and at the rate of $30.00 per month for holders of second grade certificates. The respondent, on the information he now has, estimates that there will be a considerable deficit in the appropriations for State aid for the public schools if the amounts of salaries for the teachers to be paid therefrom are as contended for by the relator, and, accordingly, he asserts, and there is no contradiction of the assertion, that there are not now sufficient funds available for, and applicable to, the payment of the salaries on the schedules demanded by the relator.

The relator seems to base his claim entirely upon the provisions of Act No. 406, approved May 31, 1933 (38 Stats. 567), entitled, "An Act to Provide a Schedule of State Aid for Public Schools," etc. It is our opinion, however, that the provisions of that Act must be considered with other

applicable provisions of the school laws, to which we hereinafter call attention.

The mentioned Act, in Section 1 thereof, provides that the General Assembly "shall make sufficient appropriation to pay the salaries of all school teachers in the public schools on the basis and for the length of term of six (6) months in the elementary and high schools in the State," on the terms and conditions set forth in the Act.

In Section 11, there was appropriated for the school session of 1933–34, in addition to the sum of $1,124,000.00, appropriated for educational purposes in the State Appropriation Bill for 1933, the sum of $1,823,000.00 from the revenues provided for in the Act, from which appropriation there was allocated the sum of $234,000.00 for transportation, and, in the section, it was expressly stated that "the amounts above shall be in full for all State aid due the respective school districts in the several counties of the State for the school session 1933–34."

By Section 12 of the Act, the Comptroller General was directed to issue his warrants monthly to the County Treasurers of the respective counties "for such amount of State school aid as may be on hand, available for, and applicable to, the payment for State school aid due the respective counties," under the provisions of the Act, and from such funds available under the 1933 General Appropriation Act for school aid for the session of 1933–34.

The provisions of the Act as to the salaries to be paid teachers and the allowance for supervision and incidentals, are contained in Section 3, which, in full, is as follows:

"That the maximum monthly salaries of teachers paid by the State shall not exceed the sum specified below: Teachers holding first grade certificates, $70.00 per month: Provided, That in no school shall the average salary exceed $60.00 per month for teachers holding first grade certificates.

"Teachers holding second grade certificates $45.00 per

month: Provided, That in no school shall the average salary exceed $40.00 per month for teachers holding second grade certificates.

"Teachers holding third grade certificates $25.00 per month: Provided, That in no case shall the salary paid by the State exceed the salary paid by the county or local school district for the term herein provided.

"Each school is also allowed for supervision or incidentals seven per cent of the amount payable to it for salaries under the terms of this Act: Provided, further, That in any school the Board of Trustees or the County Board of Education in all counties which operate under the unit plan, in their discretion, may run the school for a period of time longer than provided for herein, employing additional teachers and pay salaries in excess of the amount fixed in the above schedule, but the money required to prolong the school session and/or to provide for excess salaries or other expenses shall be provided either by the district or the county in which the same is situated, or by both."

We have not been pointed to any language of the Act, nor have we found, after a careful reading, any such language, that expressly directs the Comptroller General as to the method or manner to be pursued by him in obtaining the necessary and proper information to control and govern him in the performance of the duties imposed upon him by the provisions of Section 12, before referred to. Certainly, there is nothing in the Act that expressly requires him to act upon information furnished him by the school or fiscal authorities of any county.

Without proper information as to the amounts due the respective counties, we, of course, do not see how it would be possible for the Comptroller General to comply at all with the duties he is required to perform. To whom, therefore, should the Comptroller look for proper information and guidance? Since the Act under consideration does not

answer this question, we think it necessary to look for the answer to other provisions of the school laws.

In Section 1 of Article 11 of the Constitution, the supervision of public instruction was vested in a State Superintendent of Education, but the Constitution left it to the General Assembly to define his powers and duties. In Section 2 of that article, a State Board of Education was created, but, aside from giving that board the power to regulate the examination of teachers and the awarding of scholarships, the framers of the Constitution left the powers and duties of that board to be determined by the General Assembly.

Following the mandates of the Constitution, the General Assembly has defined the powers and duties of the State Superintendent of Education and the State Board of Education. In Section 5273 of the Code, the State Superintendent is given "general supervision over all the public school funds." That officer and the Comptroller General and the State Treasurer are authorized and directed to cooperate in the preparation of a uniform system of blanks to be used by those State officials in collecting data as to the work of the public schools. Section 5276. The County Superintendents of Education are required to make their reports, as to the public schools of their counties, to the State Superintendent of Education. Section 5313. The State Superintendent makes his report to the General Assembly. Section 5274.

The State Board of Education is particularly charged with the apportionment of certain public funds. Sections 5278 and 5285. The State Board of Education is constituted an advisory body, with whom the State Superintendent of Education shall have the right to consult when he is in doubt as to his official duty. Section 5288. That board, among other powers given to it (Section 5289), has the power "to adopt rules and regulations not inconsistent with the laws of the State for its own government and for the government of the free public schools."

The "State Aid Act," No. 539 of the Acts of 1924 (33 Stats. 916), known, generally as the "6-0-1 School Law," set out in the present Code as Sections 5478–5491, after providing the salary schedule (Section 5480); and other matters contained in the Act, stated, in Section 5487, that the State Superintendent of Education was to prescribe and furnish to the County Superintendents of Education all necessary forms and blanks for making application for State support under the State Aid Law. In Section 5488, the State Board of Education was given full authority "to prescribe all such regulations in the premises as may not be inconsistent" with the provisions of the Act and the general school laws. In Section 21 of Act No. 406, under consideration, it is expressly provided that all Acts or parts of Acts inconsistent with the provisions of the Act are repealed "to the extent of such inconsistency only." We find no inconsistency in Act No. 406 with the terms of the 6-0-1 School Law as to the powers and duties of the State Superintendent of Education and State Board of Education, nor do we find any inconsistencies in the Act with the provisions of the general school laws as to the powers and duties of those officials, to which we have heretofore called attention. Again, since the passage of the first State Aid Act, in 1924, the one known as the 6-0-1 law, the State Board of Education has been fixing the salaries to be paid by the State from the State aid funds to the teachers, and the Comptroller General, in the disbursement of the funds appropriated for State aid to the schools, has been following the directions of the State Board of Education. The General Assembly, from the reports filed with it by the State Superintendent of Education and Comptroller General, as well as from other information it had at hand, must have been fully acquainted with the fact that the State Board of Education had been fixing these salaries at the time it enacted Act No. 406. Since the legislature was well advised of the performance of those particular duties by the State Board of Education, and did

not in the Act expressly forbid that board from exercising such powers, it must be assumed that it was the intention of the legislature that the State Board of Education should continue to perform such duties and exercise such powers.

It certainly could not have been, either, the intention of the General Assembly to allow the school or fiscal authorities of the respective counties and school districts therein to absolutely fix the amounts of the salaries of teachers to be paid by the State. If that course had been followed, undoubtedly, much confusion would have arisen, and those charged with the expenditures and disbursements of the State aid school fund would have had great difficulty in arranging for an appropriation to meet properly the disbursements to be made.

We conclude, therefore, that the State Board of Education had, not only the power, but the duty, to direct the Comptroller General as to the amounts to be paid under Act No. 406 to the respective counties of the State, so long as that board acted within the provisions of the law. The action of the board, as disclosed by the record, did not transgress any provision of the law as to the salaries to be paid from State aid to the teachers. By a reference unto the provisions of Section 3 of the Act, hereinbefore quoted, it will be seen that the salaries therein specified were to be maximum salaries. In no instance was a minimum salary fixed. One of the main objects, evidently, of the General Assembly was to keep the disbursements to be made, under the law, within the appropriations made, and the revenues provided for, by that body. The General Assembly could not well know in May, 1933, when the Act was passed, the number of schools that would comply with the terms of the Act, as set forth in the first section, nor could it tell how many teachers would have to be engaged in the public schools. The amounts to be expended, under the law, depended very much, of course, upon the salaries to be paid to the teachers. We find nothing in Section 3 which justifies the claim that the

State Board of Education was required to fix a minimum salary of $50.00 per month from the State aid funds, for teachers holding first grade certificates, or a minimum salary of $40.00 per month for a teacher holding a second grade certificate. The last paragraph of that section looked to the contracting for higher salaries than that fixed under the Act, or such salaries as should be fixed by the State Board of Education within the limitations of the Act, by the trustees of the several school districts or the Board of Education in counties operating under the unit plan. In that paragraph, those local authorities were given the power to contract for salaries in excess of the amounts fixed in the schedule, with the provision, however, that the money required to pay such excess salaries should be provided for either by the district or the county. The excess salaries were not to be paid from the State aid funds.

It is clear to us, therefore, that, in issuing and sending to the County Treasurer of Beaufort County the warrant for the amount due to that county, under the law, that the respondent has properly complied with his duties, that he could not, under the law, comply with the demands of the relator, and, accordingly, the petition for mandamus must be, and is, dismissed.

MESSRS. JUSTICES STABLER, CARTER and BONHAM concur.